IN THE MATTER OF: A FILING MADE BY THE NORTH CAROLINA
FIRE INSURANCE RATING BUREAU FOR A REVIEW OF EXPERI-
ENCE OF FIRE INSURANCE

No. 525

(Filed 21 January 1969)

**1. Insurance §§ 113, 131— fire insurance — standard policy — payment for loss**

The standard fire insurance policy in effect in this State requires the insurer to pay losses not to exceed the amount specified in the policy to the extent of the cash value of the property at the time of the loss, but not exceeding the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss. G.S. 58-176.

**2. Insurance § 116— uniform fire insurance rates**

The statutes governing premium rates upon fire insurance policies covering risks in this State contemplate a uniform premium rate schedule for all companies operating in the State. G.S. Ch. 58, Art. 13.

**3. Insurance § 116— fire insurance rates — Rating Bureau**

For rate making purposes, the North Carolina Fire Insurance Rating Bureau is regarded as if it were the only insurance company operating in North Carolina and as if it had an earned premium experience, an incurred loss experience and an operating expense experience equivalent to the composite of those of the companies actually in operation.

**4. Insurance § 116— proposed rates by Rating Bureau — burden of proof**

There is no presumption that a rate filing by the Fire Insurance Rating Bureau is correct and proper, the burden being upon the Bureau to show that the proposed rate schedule is "fair and reasonable" and that it does not discriminate unfairly between risks.

**5. Insurance § 116— fire insurance rates — legislative power**

In fixing by law the fire insurance premium rate, it is the legislative power of the State which is being exercised.

**6. Insurance § 116— fire insurance rates — policies affected**

G.S. 58-131.2 requires that premium rates fixed in accordance with the statutory plan be applied only to policies issued after the rates are so established.

**7. Insurance § 116— fire insurance rates — determination of amount**

The fire insurance rate maker must determine what amount, collected as premiums at the inception of the policies hereafter to be issued, will enable the company (1) to pay losses to be incurred during the life of such policies at replacement costs prevailing at the time of such losses, (2) to pay other proper operating expenses of the company, and (3) to retain a "fair and reasonable profit."

**8. Constitutional Law § 7;　Insurance § 116—　fire　insurance　rate statutes — constitutionality**

The statutes delegating to the Commissioner of Insurance the authority to withhold approval of fire insurance rates proposed by the Rating Bureau and to fix rates which are fair and reasonable comply with the constitutional requirement that they prescribe sufficiently clear standards to control the Commissioner's discretion.

**9. Insurance § 116—　fire insurance rates — authority of Insurance Commissioner**

The Commissioner of Insurance has no authority to prescribe or regulate premium rates except insofar as that authority has been conferred upon him by statute.

**10. Insurance § 116—　fire insurance rates — factors considered**

In fixing premium rates that "will produce a fair and reasonable profit," G.S. 58-131.2, the Commissioner of Insurance is directed by the statute to consider all reasonable and related factors, including, but not limited to, the conflagration and catastrophe hazard, the past and prospective loss experience, the loss trend at the time of the investigation and the experience of the fire insurance business during a period of not less than five years next preceding the year in which the review is made.

**11. Insurance § 116—　fire insurance rates — prospective loss experience — loss trend**

As used in G.S. 58-131.2, "prospective loss experience" and present "loss trend" relate not only to the number of fires and the extent of physical destruction thereby, but also to the cost of replacement of the destroyed property.

**12. Statutes § 5—　statutory construction**

A statute must be construed in the light of the purpose to be accomplished.

**13. Insurance § 116—　fire insurance rates — determination of amount**

In order to accomplish the legislative purpose of the statutes governing fire insurance rates to provide for the public at reasonable cost insurance in financially responsible companies, the premium must be fixed at a level which will enable the insurance industry (1) to pay the losses which will be incurred during the life of the policies to be issued under such rates, (2) to pay other operating expenses, and (3) to retain a "fair and reasonable profit" and no more.

**14. Insurance § 116—　fire insurance rates — fire losses**

In fixing fire insurance rates, the Commissioner of Insurance must consider the losses, both in number and in cost, which will be incurred during the life of the policies issued under the rates fixed by him.

**15. Insurance § 116—　fire insurance rates — consideration of past experience**

While the Commissioner of Insurance is directed to consider the experience of the fire insurance business during a period of not less than

five years preceding the year of the investigation, he is not limited to that experience, but may extend his consideration to the experience of still earlier years so long as such years are "reasonable and related" to an informed judgment as to the future.

**16. Insurance § 116— fire insurance rates — evidence of changed conditions**

Evidence that present conditions are not those which prevailed during former experience is relevant to the translation of the past experience into an informed judgment concerning the future.

**17. Insurance § 116— fire insurance rates — projection into future**

The use of past experience to estimate future needs involves, of necessity, a projection of known data into the unknown future.

**18. Insurance § 116— fire insurance rate fixed by Commissioner — presumption of correctness**

A projection by the Commissioner of Insurance of past experience and present conditions into the future is presumed to be correct and proper if supported by substantial evidence, G.S. 58-9.3, and if he has taken into account all of the relevant facts which he is directed by the statute to consider. G.S. 58-131.2.

**19. Insurance § 116— fire insurance rates — presumption of correctness — opinion evidence as to what factors Commissioner should consider**

Presumption that order of the Commissioner of Insurance is correct and proper when supported by substantial evidence does not apply where order concluding that it would not be conservative and proper for the Commissioner to consider a projection of present and past cost trend in fixing future rates is based upon expert testimony to that effect, expert opinion evidence as to what things are proper for consideration by the Commissioner not being determinative since that is a matter provided by statute.

**20. Insurance § 116— fire insurance rates — projection of present and past cost trend**

Otherwise competent opinion evidence as to a projection of the present and past cost trend is, as a matter of law, relevant to determination by the Commissioner of probable loss experience of the companies during the life of policies to be issued in the near future.

**21. Insurance § 116— fire insurance rates — evidence of cost trends**

Evidence, otherwise competent, of a cost trend, upward or downward, which continues from the past to the present, and expert testimony, otherwise competent, that such trend may reasonably be expected to continue into the future so that future costs will be higher or lower than present costs is evidence of "reasonable and related factors" which G.S. 58-131.2 requires the Commissioner to consider in making his own projection into the future.

**22. Insurance § 116— fire insurance rates — use of cost trend**

It is not a proper ground for the rejection of evidence of an upward

or downward cost trend into the future that such projection has never before been used in the rate making process.

**23. Insurance § 116— fire insurance rates — credibility of evidence of cost trend**

The credibility and weight of evidence projecting the cost trend into the future are to be determined by the Commissioner of Insurance.

**24. Insurance § 116— fire insurance rate filing — rehearing**

Upon the filing, within the time allowed, of a written request for a rehearing, G.S. 58-131.5 makes the holding of such rehearing mandatory and contemplates the introduction of relevant and otherwise competent evidence at such rehearing.

**25. Insurance § 116— fire insurance rates — evidence competent at rehearing**

At a rehearing upon a filing by the Rating Bureau for a change in fire insurance rates, evidence relevant to the issues involved in the original hearing and to the reasons stated in the petition for rehearing, if otherwise competent, is admissible.

**26. Insurance § 116— fire insurance rates — rehearing — evidence originating since date of rate filing**

At a rehearing upon a filing by the Rating Bureau for a change in insurance rates, the Commissioner of Insurance erred in ruling that evidence originating subsequent to the rate filing was inadmissible as a matter of law and in refusing to permit the Rating Bureau to introduce evidence of changes in the cost level since the date of the filing which tends to corroborate the Bureau's evidence at the original hearing with reference to the cost levels likely to prevail during the life of policies to be issued in the near future.

**27. Insurance § 116— fire insurance rate hearing — complex statistical exhibits**

It is within the discretion of the Commissioner of Insurance to require complex statistical exhibits to be made available to the adverse party prior to the hearing upon fire insurance rates, to restrict or deny the use of newly developed statistical data sprung suddenly at the hearing by either party to the surprise of the other, and to grant such recess of the hearing as he may deem necessary to permit reasonable opportunity to prepare evidence to refute it.

**28. Insurance § 116— fire insurance rates — fair and reasonable profit**

G.S. 58-131.2 imposes upon the Commissioner of Insurance the duty of fixing such fire insurance rates as will produce "a fair and reasonable profit" and no more.

**29. Insurance § 116— fire insurance rates — reasonable profit — reasonable expenses**

What constitutes a "reasonable profit" cannot be determined until there is first a determination of reasonable expenses attributable to the

business operated in this State, which figure may or may not coincide with the actual expenses paid.

**30. Insurance § 116— fire insurance rates — operating expenses**

The determination by insurance companies of the propriety of expenditures for operating costs is not binding upon the Commissioner of Insurance in a rate making procedure.

**31. Insurance § 116— fire insurance rates — projection of operating expenses**

The determination of a fair and reasonable allowance for Loss Adjustment Expense and for other operating expenses, like the determination of a fair and reasonable allowance for losses, involves a projection of past experience into the immediate future.

**32. Insurance § 116— fire insurance rates — fair and reasonable profit — burden of proof**

Whether the difference between gross revenues to be derived from existing premium rates, Earned Premiums, less the combination of losses and expenses is a "fair and reasonable profit" is a question of fact to be determined by the Commissioner from the evidence, and the burden of proof is upon the Rating Bureau to show that the existing premium rates are not sufficient.

**33. Insurance § 116— fire insurance rates — determination of fair and reasonable profit**

Whether 6% of Earned Premiums is a fair and reasonable profit, an excessive profit or an insufficient profit must be determined by the Commissioner from the evidence and involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk.

**34. Insurance § 116; Judgments § 37— determination of fair and reasonable profit — res judicata**

What is a "fair and reasonable profit" varies from time to time, and a determination by the Commissioner in a former case as to what percentage of Earned Premiums constitutes a fair and reasonable profit for a fire insurance company is not *res judicata* as to that question in the current investigation.

**35. Insurance § 116— determination of necessity for increase in fire insurance rates — requisite findings of fact**

In determining whether an increase in fire insurance premium rates is necessary in order to yield a "fair and reasonable profit" in the immediate future and, if so, how much increase is required for that purpose, the Commissioner must make specific findings of fact upon substantial evidence as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same period, and (3) the percentage of Earned Premiums which will constitute a "fair and reasonable profit" in that period.

**36. Insurance § 116—   approval of only part of proposed rate increase**
     The Commissioner of Insurance need not approve or disapprove a filing
  by the Rating Bureau in its entirety but may fix premium rates which
  allow part but not all of the increase proposed by the Bureau.

ON certiorari to the Court of Appeals.

On 21 July 1967, the North Carolina Fire Insurance Rating Bureau, hereinafter called the Bureau, filed with the Commissioner of Insurance, hereinafter called the Commissioner, its proposal, hereinafter called the filing, that premium rates on fire insurance policies thereafter to be issued in North Carolina be adjusted. The proposed adjustments included increases in certain premium rates and decreases in others, the net result being an "overall increase of 2.54 per cent," which would produce approximately $1,000,000 a year in additional premium revenue.

Following a hearing, the Commissioner entered his order denying the filing in its entirety. A rehearing was had on the Bureau's petition. The Commissioner reaffirmed the denial. The Bureau appealed to the Superior Court of Wake County which affirmed the orders of the Commissioner. The Bureau then appealed to the Court of Appeals. On 14 August 1968, that Court rendered its decision, reported in 2 N.C. App. 10, 162 S.E. 2d 671, remanding the matter for further proceedings. Both the Bureau and the Commissioner filed in this Court petitions for certiorari to review the judgment of the Court of Appeals. Both petitions were allowed.

The rates now in effect were fixed by the decision of the Commissioner upon a filing by the Bureau on 18 March 1966.

### The Present Filing And Attached Exhibits

To the present filing the Bureau attached numerous statistical exhibits. These set forth, year by year, data showing the aggregates of premiums collected, premiums earned, losses paid and losses incurred by the fire insurance companies operating in North Carolina upon the risks insured by them in this State, together with various computations deemed by the Bureau appropriate to adjust such premium data to the presently effective premium rates and such loss data to current costs. The cost adjustment was made upon the basis of a Composite Current Cost Index Factor, computed from the Consumer Price Index and the Construction Cost Index published by the United States Department of Labor and the United States Department of Commerce, respectively.

By these procedures the Adjusted Earned Premiums and Adjusted Incurred Losses upon the North Carolina operations of all

companies combined were computed for each of the years 1961 to 1966, inclusive. A Loss Ratio (i.e., the ratio of such losses to such premiums) was then computed for each of those years. That is, the Loss Ratio for each such year was computed as if the current premium rates had been in effect in that year and the current cost levels, projected by computation to 30 June 1968, had also been in effect in that year.

With reference to the projection into the then future of its Composite Cost Index, the filing stated:

"In this 1967 filing, the Bureau renews its insistence that correct ratemaking requires proper consideration of current cost trends and renews its application of a composite current cost index factor, improved and made more realistic and accurate by projecting current costs into the period for which the rates are being made. Such projection is a carrying forward into such future period of the curve of current costs established by the experience of past years."

Having so computed the Loss Ratio for each of the years, the Bureau then weighted these ratios, assigning the weight of 30% to the 1966 ratio, 25% to that of 1965, 15% to that of 1964, and 10% to that of each of the preceding three years. It thus derived a composite Weighted Loss Ratio for the six years of $49.95% which it rounded off to 50%. To this it added 3.8% for Loss Adjustment Expenses, making a total of 53.8%.

By the process described below, the Bureau determined that the Balance Point Loss Ratio was $52.3%; that is, when the Loss Ratio, including Loss Adjustment Expense, adjusted as above described, is 52.3% of the Earned Premiums, adjusted as above described, no change in premium rates is required in order to give the companies a "fair and reasonable profit" within the meaning of G.S. 58-131.2.

Dividing the so computed Loss Ratio, including Loss Adjustment Expense, of 53.8% by the Balance Point Loss Ratio of 52.3%, the Bureau derived the figure of 102.9% (i.e., the ratio of the computed Loss Ratio, including Loss Adjustment Expense, to the said Balance Point Loss Ratio) and thereby reached the conclusion that a 2.9% increase in the overall premium rate (and so in the Earned Premiums) would be "fair and reasonable" (a non-sequitur as shown below). It then proposed detailed adjustments of rates on the various classifications of risk which would yield an overall increase of 2.54%, whilch was the overall increase proposed in the filing. That is, it proposed an increase slightly less than it contends would be justified.

The Bureau computed the Balance Point Loss Ratio in the following manner:

Taking the ratio of Expense, exclusive of Loss Adjustment Expense, to Earned Premiums, adjusted as above described, as 41.7%, and the Underwriting Profit Factor as 6%, the total of these two became 47.7% of Earned Premiums. Then, by subtracting this total from 100%, the Balance Point Loss Ratio of 52.3% of Earned Premiums was derived.

That is, the filing proceeds upon the theory that when, out of each dollar of earned premiums, 41.7 cents is used to pay Expense, other than Loss Adjustment Expense, 52.3 cents is used to pay Incurred Losses, including Loss Adjustment Expense, and 6 cents is retained for Underwriting Profit, the premium rates are "in balance." Thus, the Bureau contends that premium rates yielding an Underwriting Profit of 6 cents out of each dollar of Earned Premiums are at the level contemplated by the statute.

(The fallacy in the Bureau's computation of an increase in premium rates of 2.9% as necessary to fix rates yielding a "fair and reasonable profit" is this: By its computation, including all adjustments and projections, out of each dollar of Earned Premiums, at present rates, 53.8 cents will be needed to pay reasonably anticipated losses, including Loss Adjustment Expense, 41.7 cents will be needed to pay Expense, other than Loss Adjustment Expense, leaving only 4.5 cents for Underwriting Profit, which last figure the Bureau says should be 6 cents. To increase the premium rate by 2.9%, will increase the present Earned Premium dollar to $1,029, but will not increase the amount needed to pay anticipated losses, including Loss Adjustment Expense, or the amount needed to pay other Expense. The total of these will remain at 95.5 cents, leaving for Underwriting Profit not 6 cents but 7.4 cents. If an adjustment of the Expense, other than Loss Adjustment Expense, for a resulting increase in taxes is appropriate, neither the necessity nor the amount thereof appears in the record.)

The exhibits attached to the filing do not show how the Bureau computed Expense, other than Loss Adjustment Expense. Presumably, this was derived from reports filed with the Bureau by the companies. (If it is a mere theoretical figure rather than an actual computation, a different question arises.)

The reasonableness of such ratio of Expense to Earned Premiums, that is, 41.7 cents out of each premium dollar earned, does not appear from the filing or the exhibits attached thereto. Similarly,

the derivation of the conclusion that Underwriting Profit should be 6 cents out of every premium dollar earned does not appear upon the filing or the exhibits attached thereto.

The Bureau's exhibit, upon which it computed the ratio of Expense, exclusive of Loss Adjustment Expense, to Earned Premiums, adjusted, to be 41.7% shows the computation consists of three steps. First, the ratio of certain expenses, designated in this record only by reference to certain schedules, to *Written* Premiums is computed at 28.5%. Second, the ratio of All Other Expense to *Earned* Premiums is computed at 17.0%. Third, these percentages are added together, notwithstanding the fact that one is a ratio of one part of the expenses to *Written* Premiums and the other is the ratio of another part of the expenses to *Earned* Premiums, thus deriving the figure of 45.5%. The arithmetical total of these two percentages is certainly 45.5, but obviously it is not 45.5% either of Written Premiums or of Earned Premiums. From this figure of 45.5% of something, the Bureau has subtracted its figure of 3.8% for Loss Adjustment Expense without specifying whether this is 3.8% of Written Premiums or of Earned Premiums or of something else. The result of this subtraction is the figure of 41.7% used in the Bureau's computation of the Balance Point Loss Ratio. It would appear, though not clearly, that, in computing the Balance Point, the Bureau regarded this figure as 41.7% of Earned Premiums, adjusted.

At neither the hearing nor the rehearing before the Commissioner did the Bureau offer any evidence to show any breakdown of Loss Adjustment Expense, or of other Expense, or the reasonableness of an Underwriting Profit equal to 6 cents out of every Earned Premium dollar. The ratios of these three items to Earned Premiums, adjusted, 3.8%, 41.7% and 6%, respectively, are merely stated as facts in the computation of the Balance Point Loss Ratio upon an exhibit attached to the filing. The Insurance Department offered no evidence or contention with respect to such use of these ratios. In neither order of the Commissioner is the correctness of any of these ratios, or of the resulting Balance Point Loss Ratio, found as a fact or discussed.

### The First Hearing Before The Commissioner

At the first hearing before the Commissioner, the Bureau introduced in evidence the filing and the exhibits attached thereto, together with testimony of its actuary and of another expert witness. The Department of Insurance appeared in opposition to the approval of the filing and introduced the testimony of its actuary. There was no other opposition.

There was no evidence in support of or in opposition to the use by the Bureau, in its exhibit, of the above mentioned ratios to Earned Premiums, adjusted, of Loss Adjustment Expense, Expense, exclusive of Loss Adjustment Expense, and Underwriting Profit or of the resulting Balance Point.

The Department of Insurance did not attack or question the correctness of any data appearing on the exhibits of the Bureau, or of any mathematical computation thereon, or the accuracy or relevancy of the Bureau's Composite Current Cost Index Factor, as of the date of the filing, or the accuracy of either of the price indices used by the Bureau in computing it.

Likewise, the Bureau offered no evidence to substantiate, and the Department of Insurance presented neither evidence nor contention in disagreement with, the weighting process by which the yearly loss ratios, adjusted to current premium rates and current costs, were further adjusted in arriving at the composite Loss Ratio to Earned Premiums of 53.8% as of the then future date of 30 June 1968. The witness for the Bureau simply stated that these were "weights developed by actuarial judgment" (i.e., the judgment of an undesignated actuary) ; that the weighting process was so developed and first "recommended" by the Fire Insurance Research & Actuarial Association to the fire insurance rating bureaus of the several states in March of 1958; that "this principle is now accepted and used in the great majority of the States, including North Carolina," and that this weighting process "has helped to develop more responsive rate levels so that the future underwriting experience came closer to being at the proper point." In this instance, the weighting process resulted in a composite Loss Ratio lower than the simple arithmetical average of the Loss Ratios of the six years, adjusted to current premium rates and current costs, by reason of the fact that the Loss Ratio for 1966, so computed, was the lowest of all of such ratios for the six years.

The evidence of the Bureau is further to the effect that "attention was turned in 1964 to the question of differences in cost levels represented by the incurred losses used in the review period." That is, the evidence of the Bureau shows that, for the purpose of adjusting past loss experience to future conditions, the weighting device was first developed and put into use and some years later the cost index device was developed and put into use. The evidence of the Bureau does not show, and the evidence of the Department of Insurance does not question, the necessity or propriety of using both devices cumulatively as was done in the exhibits of the Bureau in

the present matter. Neither order of the Commissioner makes reference to the cumulative effect of these adjustments of loss experience.

The actuary for the Bureau testified that he had computed, by a method not challenged by the Department of Insurance, the cost trend curve on the basis of the above mentioned Composite Current Cost Index and had projected this trend to 30 June 1968 on the assumption that, in such then future period, the index would continue to rise on the same curve. It was upon this basis that he computed the Loss Ratio, including Loss Adjustment Expense, at the above mentioned figure of 53.8% of Earned Premiums, adjusted. He testified:

> "In each of these indices, for each of the seven years, there is an increase, a trend upward in each one. * * * What we have done, based on those seven years of experience, is to assume that for each of the months through June 30, 1968, there would be a similar increase in the Composite Current Cost Index Factor. * * *

> "As an expert statistician and actuary, I know that this is the current assumption among experts, and I do not know of any reliable statistical authority or economist that predicts that prices will fall in the next eighteen months."

The actuary of the Department of Insurance did not take issue with the cost trend curve as calculated and plotted by the actuary for the Bureau, or with his prediction as to the cost level to be expected for 30 June 1968. His attack was upon any use of a projection of the cost trend into the future for rate making purposes. He testified:

> "In my opinion, I do not consider the method of adjusting the incurred losses as used by the Bureau in this filing to be conservative. * * *

> "In my opinion, I do not consider the method used insofar as Fire Insurance rate-making in North Carolina to be proper. My reasons are that such an adjustment necessarily must be based on assumptions and conjecture and economics and political or natural events of the future could have an effect on either the Consumer Price Index or the Composite Construction Cost Index, or both. I do not feel that such a projection is proper."

The actuary for the Department of Insurance accepted and used the Bureau's Composite Current Cost Index up to the level of 31 December 1966, the end of the experience period used in the Bureau's

calculations. At that level of costs he concluded that no increase in premium rates was required. With this conclusion the actuary for the Bureau was not in disagreement. That is, the Bureau agreed that if the costs of replacing burned property were to continue at the 31 December 1966 level throughout the life of the policies to which the proposed rates were to apply, no increase in premium rates would be justified.

### The First Order Of The Commissioner

The Commissioner made the following material findings of fact:

"3. The Consumer Price Index and the Construction Cost Index are reasonable measures of historical price changes.

\* \* \*

"6. The use of the cost factor to adjust loss statistics up to the latest available data of the filing [i.e., 31 December 1966] would produce a rate indication of no change.

"7. The loss trend in North Carolina for fire insurance for the period 1961-1968 has generally [been] stable with no pronounced upward or downward trend."

The Commissioner thereupon reached the following conclusion:

"In its rate proposal the Bureau has departed from methods previously approved. It has estimated the costs of the future using a projection based on certain price indices. It is the opinion of the undersigned Commissioner of Insurance that the adjustment method used is neither conservative nor proper as it is based upon supposition and conjecture and the rate developed by the use of such an adjustment method would be unreasonable. Had the Bureau adjusted losses up to the date of the latest available statistical information in the filing, the rate-making method would have indicated no. change in rates.

"The rate proposal is, therefore, denied."

### The Rehearing Before The Commissioner

At the rehearing the Bureau offered in evidence statistical data, issued by the above mentioned departments of the Federal Government after the original hearing, which brought its Composite Current Cost Index up through August 1967, and also such data bringing that index up through September 1967. These data were made available to the Department of Insurance by the Bureau approximately one month prior to the rehearing.

The Bureau further offered in evidence exhibits, identical to

those made part of the filing, except that the cost level figures so derived for 31 August 1967 and 30 September 1967, respectively, were substituted, in the computations of the Loss Ratio in these new exhibits, for the projection to 30 June 1968, used in the exhibit attached to the filing and introduced at the original hearing. That is, in the exhibits offered at the rehearing, the Bureau did not use a projection of the experienced cost trend but used the actual index figures for August and September 1967, respectively. The Loss Ratio, so computed on the basis of the experienced cost level for 30 September 1967, was the same as that formerly computed on the basis of the projection of the trend to 30 June 1968. That computed on the basis of the experienced cost level for 31 August 1967 was slightly less.

The Commissioner sustained objections by the Department of Insurance to the introduction of these data, and the exhibits containing them, on the ground that such data had originated or had been developed since the date of the filing. That is, the Commissioner ruled that evidence could not be received to show changes in the cost level since the date of the filing.

There was no contention by the Department of Insurance that it was taken by surprise by the offer of such evidence and no request by it for an adjournment so as to permit it to study the new data. The actuary for the Bureau testified that with the new data he was able in approximately ten minutes to make the appropriate modifications of the exhibits originally attached to the filing. Again, the Department of Insurance did not take issue with the arithmetical correctness of the computations so made.

### Second Order Of The Commissioner

On 20 December 1967, the Commissioner entered his order affirming his previous refusal to approve the filing, basing this order upon the following conclusions:

"In this rehearing the Bureau did not present acceptable statistical data or other evidence to warrant any modification, change or recission.

"The undersigned Commissioner of Insurance rejects the introductions and acceptance of newly developed evidence (that is, evidence originating subsequent to the date of the filing). The orderly consideration of a rate filing requires a reference point, in time, for the comparison of premiums, losses and expenses. To permit the continual introduction of newly developed statistical data, as the Bureau has proposed to do, would pre-

clude a careful, thoughtful analysis of the matter under review and, in the opinion of the undersigned Commissioner of Insurance would not serve the public interest."

### Judicial Review

The Superior Court of Wake County affirmed the two orders of the Commissioner, the court concluding: (1) There is in the record substantial evidence to support the Commissioner's ruling that the method employed by the Bureau in its computation of the loss ratio was not proper and reasonable; and (2) the sustaining of the objections to the evidence offered by the Bureau at the rehearing was within the discretion of the Commissioner.

The Court of Appeals held: (1) It could not say that the method used by the Commissioner for weighting the loss ratios in the several years did not comply fully with the statutory requirement that the Commissioner consider the prospective loss experience based on current loss trend; but (2) the Commissioner erred in refusing to admit in evidence and consider the statistical data offered at the rehearing. It, therefore, remanded the matter for further proceedings consistent with its opinion.

The Bureau petitioned for certiorari to review the first of these rulings. The Department of Insurance petitioned for certiorari to review the second.

*Attorney General Bruton and Assistant Attorney General Harrell for North Carolina Insurance Commissioner.*

*Joyner & Howison for North Carolina Fire Insurance Rating Bureau.*

Lake, J.

Following the decision in *United States v. Southeastern Underwriters. Association,* 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440, the Legislature of this State enacted the statutes under which the premium rates upon fire insurance policies covering risks in this State are governed. These are found in Chapter 58, Article 13, of the General Statutes. They have not been amended in any respect material to the present inquiry since their enactment.

In only one case, *In Re Rating Bureau,* 245 N.C. 444, 96 S.E. 2d 344, have these statutes been before this Court. The decision in that case is not determinative of the questions involved in the present litigation. The carefully prepared briefs, both of counsel for the

Bureau and of the Attorney General, advise us that counsel have found no decisions of other courts directly in point upon these questions and our own research has disclosed none. Certain fundamental principles of rate or price regulation, recognized and applied by this Court in decisions concerned with the regulation of public utility rates under Chapter 62 of the General Statutes, are applicable to this matter in a general way, but the statutory provisions governing the two rate making procedures are substantially different. Consequently, we are plowing new ground. If the process turns up a need for revision or supplementation of the existing statutes governing insurance premium regulation, a session of the Legislature is, fortunately, at hand.

### The Pertinent Statutes

G.S. 58-125 provides: "There is hereby created a bureau to be known as the 'North Carolina Fire Insurance Rating Bureau.'"

G.S. 58-126 provides: "The provisions of this article shall apply to insurance against loss to property located in this State, or to any valuable interest therein, by fire, * * *"

G.S. 58-127 provides: "Under the supervision of the Commissioner of Insurance * * * insurance companies authorized to effect insurance in this State against the risk of loss by perils within the scope of this act, shall organize a rating bureau for the purpose of making rates and rules and regulations which affect or determine the price which policyholders shall pay for insurance covered by this article, on property or risks located in this State; and all companies now or hereafter authorized to transact such business in this State shall become members of such bureau.

"The government of the rating bureau shall be vested in its members * * *"

G.S. 58-130 provides: "Every insurer shall file annually with the rating bureau * * * its underwriting experience in this State in accordance with classifications approved by the Commissioner. * * *"

G.S. 58-131 provides: "The rating bureau in making rates shall not unfairly discriminate between risks involving essentially the same construction and hazards, and having substantially the same degree of protection."

G.S. 58-131.1 provides: "No rating method, schedule, class-

ification, underwriting rule, bylaw, or regulation shall become effective or be applied by the rating bureau until it shall have been first submitted to and approved by the Commissioner. * * *"

G.S. 58-131.2 provides: "The Commissioner is hereby empowered to investigate at any time the necessity for a reduction or increase in rates. If upon such investigation it appears that the rates charged are producing a profit in excess of what is fair and reasonable, he shall order such reduction of rates as will produce a fair and reasonable profit only.

"If upon such investigation it appears that the rates charged are inadequate and are not producing a profit which is fair and reasonable, he shall order such increase of rates as will produce a fair and reasonable profit.

"In determining the necessity for an adjustment of rates, the Commissioner shall give consideration to all reasonable and related factors, to the conflagration and catastrophe hazard, both within and without the State, to the past and prospective loss experience, including the loss trend at the time the investigation is being made, and in the case of fire insurance rates, to the experience of the fire insurance business during a period of not less than five years next preceding the year in which the review is made.

"Any reduction or increase of rates ordered by the Commissioner shall be applied by the rating bureau subject to his approval within sixty (60) days and shall become effective solely to such insurance as is written having an inception date on and after the date of such approval.

"Whenever the Commissioner finds, after notice and hearing, that the bureau's application of an approved rating method, schedule, classification, underwriting rule, bylaw or regulation is unwarranted, unreasonable, improper or unfairly discriminatory he shall order the bureau to revise or alter the application of such rating method, schedule, classification, underwriting rule, bylaw or regulation in the manner and to the extent set out in the order."

G.S. 58-131.3 provides: "No insurer * * * shall knowingly issue or deliver or knowingly permit the issuance or delivery of any policy of insurance in this State which does not conform to the rates, rating plans, classifications, schedules, rules and standards made and filed by the rating bureau. * * *"

G.S. 58-131.5 provides: "The Commissioner shall not make any rule, regulation or order under the provisions of this article without giving the rating bureau and insurers who may be affected thereby reasonable notice and a hearing if hearing is requested. * * *

"At the conclusion of such hearing, or within thirty (30) days thereafter, the Commissioner shall make such order or orders as he may deem necessary in accordance with his finding. Within thirty (30) days after receiving written notice of any such order or finding any person affected thereby may request a rehearing or review thereon before the Commissioner by filing a written request setting forth a summary of the reasons therefor. Upon receipt of such request, the Commissioner shall set a date for rehearing. Such application for rehearing shall act as a stay of the provisions of such order. The Commissioner may modify, change or rescind such order if he finds that the facts shown at the rehearing warrant such modification, change or rescission. * * *"

G.S. 58-131.8 provides: "A review of any order made by the Commissioner in accordance with the provisions of this article, shall be by appeal to the Superior Court of Wake County in accordance with the provisions of § 58-9.3."

G.S. 58-9.3 provides: "(a) Any order or decision made, issued or executed by the Commissioner * * * shall be subject to review in the superior court of Wake County * * *

"(b) * * * The order or decision of the Commissioner if supported by substantial evidence shall be presumed to be correct and proper. * * *

"* * * The cause shall be heard by the trial judge as a civil case upon transcript of the record for review of findings of fact and errors of law only. * * *

"(c) The trial judge shall have jurisdiction to affirm or to set aside the order or decision of the Commissioner and to restrain the enforcement thereof.

"(d) Appeals from all final orders and judgments entered by the superior court in reviewing the orders and decisions of the Commissioner may be taken to the Supreme Court of North Carolina by any party to the action as in other civil cases. * * *"

[1] G.S. 58-176 prescribes the terms of the standard fire insurance policy to be issued in this State and, among other things, pro-

vides that such policy shall state: "[T]his Company * * * does insure [the policyholder] and legal representatives, to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss * * *" not to exceed the amount specified in the policy.

[2-4]   It is readily apparent that this statutory plan contemplates a uniform premium rate schedule for all companies operating in the State. For rate making purposes, the Bureau is to be regarded as if it were the only insurance company operating in North Carolina and as if it had an earned premium experience, an incurred loss experience and an operating expense experience equivalent to the composite of those of the companies actually in operation. There is no presumption that a rate filing by the Bureau is correct and proper. *In Re Rating Bureau, supra.* The burden is upon the Bureau to show that the rate schedule proposed by it is "fair and reasonable" and that it does not discriminate unfairly between risks. *In Re Rating Bureau, supra.*

### The Relevancy Of The Cost Trend Projection

[5, 6]   In fixing by law the premium rate, it is the legislative power of the State which is being exercised. It is not only impractical to fix premium rates retroactively, it is expressly required by G.S. 58-131.2 that premium rates fixed in accordance with the statutory plan be applied only to policies issued after the rates are so established. Consequently, the entire procedure contemplates a looking to the future.

[7]   The policy contracts fix in advance the premiums to be charged therefor by the issuing company. For the premiums so fixed at the inception of the policy, the company contracts that it will pay, within the maximum limit stated in the policy, the cost of replacing property destroyed by fire occurring in the then future. Thus, the amount which the company is obligated to pay is measured not by the cost of such replacement at the inception of the policy but by the cost of such replacement at the time of the fire. G.S. 58-176. Consequently, the problem for the rate maker is to determine what amount, collected as premiums at the inception of the policies hereafter to be issued, will enable the company (1) to pay losses to be incurred during the life of such policies, at replacement costs prevailing at the time of such losses, (2) to pay other proper operating expenses of the company, and (3) to retain a "fair and reasonable profit."

Fire insurance is an economic necessity for owners of property. A policy issued by an insolvent company is no insurance at all, or virtually so. In the foregoing statutory plan, the State has undertaken to make available to its people the economic necessity of fire insurance policies, which actually insure, by authorizing the Bureau to propose premium rates just as would a single company having a monopoly of the fire insurance business in North Carolina. To protect the public against the danger of exorbitant rates for this economic necessity, which danger is inherent in monopolistic price fixing, the Legislature has vested in the Commissioner its own authority to withhold approval of such rates proposed by the Bureau and to fix rates which are fair and reasonable.

[8] It is beyond question that the Legislature may so delegate this authority to an administrative officer provided it prescribes sufficiently clear standards to control his discretion. See: *Harrill v. Retirement System* and *Bird v. Retirement System,* 271 N.C. 357, 156 S.E. 2d 702; *Utilities Com. v. State and Utilities Com. v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310. The statutory plan above set forth complies with that constitutional requirement.

[9] Obviously, the Commissioner of Insurance has no authority to prescribe or regulate premium rates, except insofar as that authority has been conferred upon him by the above mentioned statutes. In exercising that authority he must comply with the statutory procedures and standards.

[10] Specifically, G.S. 58-131.2 directs him to fix premium rates such as "will produce a fair and reasonable profit" and no more. In reaching this end result, he is directed by that statute to "give consideration to all reasonable and related factors," including, but not limited to, the conflagration and catastrophe hazard, the past and prospective loss experience, the loss trend at the time of the investigation and the experience of the fire insurance business during a period of not less than five years next preceding the year in which the review is made.

[11] It will be observed that the experience of the companies in the five calendar years next preceding the year of the investigation is not the sole factor to be considered by the Commissioner in fixing the rates for the future. He is also directed to consider the "prospective loss experience, including the loss trend at the time the investigation is being made." Admittedly, these terms are not as precise as might be desirable. It, nevertheless, seems clear that the "prospective loss experience" and the present "loss trend" relate,

not only to the number of fires and to the extent of the physical destruction thereby, but also to the cost of replacement of the destroyed property.

[12, 13]    A statute must be construed in the light of the purpose to be accomplished. *In Re Dillingham,* 257 N.C. 684, 127 S.E. 2d 584; *Greensboro v. Smith,* 241 N.C. 363, 85 S.E. 2d 292; *Cab Company v. Charlotte,* 234 N.C. 572, 68 S.E. 2d 433. Here, the purpose of the statute is to provide for the public, at reasonable cost, insurance in financially responsible companies. Not only fair play but the accomplishment of this legislative purpose as well requires that the premium be fixed at a level which will enable the insuring company (i.e., the entire insurance industry in this State treated as if it were one company) (1) to pay the losses which will be incurred during the life of the policies to be issued under such rates, (2) to pay other operating expenses, and (3) to retain a "fair and reasonable profit" and no more.

[14]    To accomplish this purpose the Commissioner must consider the losses, both in number and in cost, which will be incurred in the future; i.e., during the life of the policies issued under the rates fixed by him. Obviously, the determination of the cost of replacing losses to be incurred at price levels then to prevail is a matter of informed judgment and not of precise calculation. Such judgment can be formed only by consideration both of the past experience and of the present prevailing conditions. This is true both as to the number and physical extent of the losses to be anticipated and as to the cost of replacing such losses as they occur.

[15, 16]    For this reason, the statute specifically directs the Commissioner to consider the experience of the fire insurance business during a period of not less than five years preceding the year of the investigation. He is not limited, however, to that experience, but may extend his consideration to the experience of still earlier years, so long as such years are "reasonable and related" to an informed judgment as to the future. Evidence that present conditions are not those which prevailed during such former experience is, obviously, relevant to the translation of the past experience into an informed judgment concerning the future. For example, the past loss experience should be adjusted to take into account any newly discovered practicable procedures and devices for reducing the risk of fire. Similarly, recent events reliably indicating a rise, or a fall, in replacement costs previously experienced is a relevant circumstance in determining the extent to which past experience supplies a reliable guide to the future in the matter of replacement costs.

[17]   The use of past experience to estimate future needs involves, of necessity, a projection of known data into the unknown future. See: *Los Angeles Gas & Electric Corporation v. Railroad Commission*, 289 U.S. 287, 311, 53 S. Ct. 637, 77 L. Ed. 1180; *McCardle v. Indianapolis Water Company*, 272 U.S. 400, 408, 47 S. Ct. 144, 71 L. Ed. 316; *Central Maine Power Company v. Public Utilities Commission*, 153 Me. 228, 136 A. 2d 726, 732-735. To bring past experience to the present level, by pro forma adjustments of premiums earned and losses incurred, and then to stop the adjusting process, is to project into the future the assumption that there will be no further change in the incidence of fires, in the extent of physical destruction thereby or in the cost of replacing the destroyed property. The question, therefore, is not whether a projection shall be made by the Commissioner, from the present into the future, for that is inevitable in the discharge of his statutory duty of fixing, for the future, a fair and reasonable premium rate. The question is as to the relevancy and trustworthiness of proposed evidence to and in the determination of the direction of such projection.

[18]   As the Court of Appeals stated, the Commissioner of Insurance "is a specialist in the field" and has been given by the Legislature the authority and the duty to set rates which will, in the future, produce a fair and reasonable profit and no more. His projection of past experience and present conditions into the future is presumed to be correct and proper if supported by substantial evidence, G.S. 58-9.3, and if he has taken into account all of the relevant facts which he is directed by the statute to consider. G.S. 58-131.2.

[19, 20]   The expert opinion of a witness, however well informed, as to what things are proper for consideration by the Commissioner in making his projection is not determinative. That is a matter determined by the provisions of the statute. Thus, the presence in this record of testimony of the actuary for the Department of Insurance that, in his admittedly expert opinion, it would not be "conservative" or "proper" for the Commissioner, in fixing rates for the future, to consider a projection of the present and past cost trend does not afford a basis for calling into play the statutory presumption that the order of the Commissioner, resting upon the same conclusion, is correct and proper because "supported by substantial evidence." We hold that otherwise competent opinion evidence as to such projection is, as a matter of law, relevant to the determination by the Commissioner of the probable loss experience of the companies during the life of policies to be issued in the near future. Here, the Commissioner has expressly refused to consider the evidence at all.

[21] Like the Court of Appeals, we cannot determine, and we have no authority to determine, whether the weighting process used by the Bureau in translating past experience into present conditions, plus the further adjustment of past experience to the present by applying to past costs inflation already experienced, leads, without more, to a correct projection of past experience and present conditions into that part of the future covered by policies hereafter to be issued. That question we do not determine. What we do hold is that evidence, otherwise competent, of a cost trend, upward or downward, which continues from the past into the present, and expert testimony, otherwise competent, that such trend may reasonably be expected to continue into the future, so that future costs will be higher or lower than present costs, is evidence of "reasonable and related factors" which G.S. 58-131.2 requires the Commissioner to consider in making his own projection into the future.

[22] It is not a proper ground for the rejection of such evidence that such projection of an upward or downward cost trend into the future has never before been used in the rate making process. The statute does not contemplate that procedures and methods for determining replacement costs for the future shall be frozen. See; *National Bureau of Casualty Underwriters v. Superintendent of Insurance,* 6 A.D. 2d 73, 174 N.Y.S. 2d 836, 840.

[23] In its holding that consideration of a prevailing cost trend, established by otherwise competent and credible evidence, is "a policy matter and should rest with the Commissioner," we think the Court of Appeals erred and to that extent its decision is hereby reversed. We conclude that the evidence offered by the Bureau as to the probability of a cost level on 30 June 1968 higher than that prevailing at the time of the filing, or at the time of the hearing before the Commissioner, was relevant and was improperly excluded by the Commissioner from his consideration. Its credibility and weight, as distinguished from its relevancy, are to be determined by the Commissioner. See: *Insurance Department v. City of Philadelphia,* 196 Pa. Super. 221, 173 A. 2d 811; *Long v. National Bureau of Casualty Underwriters (Tenn.),* 354 S.W. 2d 255. It is not, necessarily, more speculative than is expert testimony as to pain, suffering and disability to be experienced in the future by an injured person.

### The Exclusion Of Evidence At The Rehearing

[24, 25] Upon the filing, within the time allowed, of a written request for a rehearing, G.S. 58-131.5 makes the holding of such rehearing mandatory. The statute clearly contemplates the introduc-

tion of relevant and otherwise competent evidence at such rehearing. The application for a rehearing, itself, automatically stays the former order of the Commissioner. We think it clear from the statute that, at such rehearing, evidence relevant to the issues involved in the original hearing and to the reasons stated in the petition for rehearing, if otherwise competent, is admissible.

[26]    The evidence offered by the Bureau at the rehearing consisted of data, the credibility of which is not questioned by the Department of Insurance or the Commissioner, and which, if true, tends to corroborate the Bureau's evidence at the original hearing with reference to cost levels likely to prevail during the life of policies to be issued in the near future. Having determined that like evidence was properly admitted at the original hearing by the Commissioner, and should have been taken into consideration by him in making his own projection for the future, it follows that the evidence offered at the rehearing was relevant and should have been admitted and considered.

We affirm the holding of the Court of Appeals that in sustaining the objection to this evidence at the rehearing the Commissioner was in error. Neither the Department of Insurance, any other protestant, nor the Bureau is confined to evidence relating to conditions prevailing at the date of the filing and to experience prior thereto. While the statute requires that a hearing by the Commissioner upon a filing by the Bureau be held promptly, it is well within the bounds of possibility that, between the filing and the hearing, experience may be had which would be most relevant to the determination of the direction of a projection of the present "loss trend" into the future. Such change in conditions after the date of the filing might indicate a sharply downward trend in construction costs or in fire hazard. Surely, the statute does not contemplate that the Commissioner should shut his eyes to such a change in conditions after the date of the filing. It is equally clear that the Bureau may offer evidence of more recent experience which corroborates its allegations in the filing. The situation is somewhat analogous to testimony by a doctor as to the condition of a personal injury plaintiff observed in an examination conducted after the complaint was filed.

[27]    It is, of course, within the sound discretion of the Commissioner to require complex statistical exhibits to be made available to the adverse party prior to the hearing, to restrict or deny the use of newly developed statistical data sprung suddenly at the hearings by either party to the surprise of the other, and to grant such recess of the hearing as he may deem necessary to permit rea-

sonable opportunity to study such data and to prepare evidence to refute it. That is not the situation presented in this record. Here, the Commissioner simply ruled, as a matter of law, that all evidence, however relevant, would be cut off as of the date of the filing. In this he did not follow the mandate of the statute.

*Matters To Be Determined Upon The Remand To The Commissioner*

We affirm the judgment of the Court of Appeals remanding the cause for further proceedings before the Commissioner. Those proceedings are to be conducted in accordance with this opinion. Their purpose will be to fix premium rates in accordance with the statutory plan. Since such further proceedings are to be had, we deem it advisable to discuss briefly questions which will necessarily arise therein.

When *In Re Rating Bureau, supra,* was decided by this Court, it was noted, "The question as to whether a 50 per cent loss ratio is a proper division of a premium dollar is not before us for decision." Neither is that question before us upon this appeal, for this record does not indicate that it has been determined by the Commissioner. It will be before him, however, upon the remand hearing and must be determined by him.

[28] G.S. 58-131.2 imposes upon the Commissioner the duty of fixing such rates as will produce "a fair and reasonable profit" and no more. In the statutory plan for the regulation of insurance premium rates, there is nothing comparable to the procedure prescribed by G.S. 62-133 for the fixing of rates by public utility companies for their services. The statutes conferring authority upon the Commissioner of Insurance, and directing his use of it, do not use the term "fair return on fair value" of the property devoted to the insurance business in North Carolina. Here, the direction is to prescribe rates which will yield a "reasonable profit." See, *Insurance Department v. City of Philadelphia, supra.*

[29-31] There are, however, certain underlying principles common to both price fixing processes. Neither a "fair return on fair value" nor a "reasonable profit" can be determined until there is first a determination of reasonable expenses attributable to the business operated in this State. See, *National Bureau of Casualty Underwriters v. Superintendent of Insurance, supra.* This figure may or may not coincide precisely with the actual expenses paid. Obviously, the operating companies must be given substantial freedom of management, including the incurring of operating expenses such as salaries, but, like public utility companies, their determination of the

propriety of expenditures for operating costs is not binding upon the Commissioner in a rate making procedure. This is true both of Loss Adjustment Expense and of other operating expenses. The determination of a fair and reasonable allowance for Loss Adjustment Expense and for other operating expenses, like the determination of a fair and reasonable allowance for losses, involves a projection of past experience into the immediate future.

[32]    This determination having been made, it remains to be determined whether the difference between gross revenues to be derived from existing premium rates, Earned Premiums, less the combination of losses and expenses is a "fair and reasonable profit." This is not a question of law, nor is it a question upon which the determination of the Bureau is conclusive. It is a question of fact to be determined by the Commissioner upon evidence. As to this, as well as to the other factors in the equation, the burden of proof is upon the Bureau to show that the existing premium rates are not sufficient.

[33]    There is nothing sacrosanct about 6% in this connection. Whether six cents out of each dollar of gross revenue, i.e., Earned Premiums, is a fair and reasonable profit, an excessive profit or an insufficient profit must be determined by the Commissioner from evidence and this, too, involves a projection into the future of past experience and present conditions. It involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk.

[34]    Like construction costs and consumer prices, a "fair and reasonable profit" varies from time to time. There is nothing in this record to show that the Commissioner has ever determined what percentage of Earned Premiums constitutes a fair and reasonable profit for a fire insurance company. If upon the remand hearing of the present matter such finding in a former case be shown, it would not be res judicata and would not replace a finding of fact upon the question in the current investigation.

[35]    The ultimate question to be determined by the Commissioner is whether an increase in premium rates is necessary in order to yield a "fair and reasonable profit" in the immediate future (i.e., treating the Bureau as if it were an operating company whose experience in the past is the composite of the experiences of all of the operating companies), and, if so, how much increase is required for that purpose. This cannot be determined without specific findings of fact, upon substantial evidence, as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same

period, and (3) the percent of Earned Premiums which will constitute a "fair and reasonable profit" in that period. See, *National Bureau of Casualty Underwriters v. Superintendent of Insurance, supra.*

[36]    Although neither of the orders of the Commissioner so states, the Attorney General, in his brief filed on behalf of the Commissioner in this Court, appears to take the position that the Commissioner must approve or disapprove a filing by the Bureau in its entirety. We find nothing in the statutory plan for fixing premium rates which leads to this conclusion. See, *National Bureau of Casualty Underwriters v. Superintendent of Insurance, supra.* Unquestionably, the Bureau may amend its filing so as to propose a smaller increase in premium rates than that proposed in the original filing, but, in the absence of such amendment, the Commissioner, upon proper findings of fact supported by substantial evidence, may fix premium rates at a level such as to allow part but not all of the increase proposed by the Bureau, just as the Utilities Commission may do in the case of rate proposals filed with it. See, *Utilities Commission v. Telephone Co.,* 263 N.C. 702, 140 S.E. 2d 319, in which Denny, C.J., speaking for the Court, said: "[T]here is nothing in the statutes that requires the Commission to accept the rate or rates proposed, or to reject them altogether." Judicial review of such an order may be had in accordance with the statute "by any person aggrieved." G.S. 58-9.3.

The orders of the Commissioner of Insurance are hereby vacated. This matter is remanded to the Court of Appeals for the entry by it of an appropriate judgment for a further remand to the Superior Court of Wake County and thence to the Commissioner of Insurance for further proceedings in accordance with this opinion.

Modified and affirmed.