VICTORY CAB COMPANY, A CORPORATION, ET AL. v. CITY OF CHARLOTTE, A MUNICIPAL CORPORATION, HON. VICTOR SHAW, MAYOR; CLAUDE ALBEA, S. R. JORDAN, B. M. BOYD, STEVE DELLINGER, W. I. CODDINGTON, PHILLIP VAN EVERY, COUNCILMEN; HENRY YANCEY, MANAGER, L. L. LEDBETTER, TREASURER, AND J. M. ARMSTRONG, COLLECTOR OF REVENUE; AND H. H. BAXTER, COUNCILMAN.

(Filed 12 December, 1951.)

**1. Statutes § 5a—**

Ordinarily, words of a statute will be given their natural, approved and recognized meaning.

**2. Same—**

In construing an ambiguous statute, its language must be read contextually and with reference to the matters dealt with and the objects and purposes sought to be accomplished.

**3. Same—**

In construing an ambiguous statute, earlier statutes on the subject and the history of legislation in regard thereto, including statutory changes over a period of years, may be considered in connection with the object, purpose and language of the statute.

**4. Statutes § 5d—**

Related statutes should be construed so as to give full force and effect to each of them if they can be reconciled and harmonized by reasonable interpretation.

**5. Statutes § 13—**

Where provisions of related statutes are irreconcilable by any reasonable interpretation, ordinarily the last in point of enactment will prevail.

**6. Carriers § 5—**

An accepted franchise creates a contractual relation under which, in consideration of the granting of the privilege, the grantee usually obligates itself to express conditions and stipulations as to the standard of service, etc.

**7. Statutes § 13—**

Repeals by implication are not favored and will not be indulged if there is any other reasonable construction.

**8. Municipal Corporations § 7—**

Under the provisions of G.S. 20-97 (a) (b) a municipality is limited to a total annual levy of $16.00 on each taxicab operated within its limits, which limitation is not affected by the later enacted provision of G.S. 160-200 (36a) authorizing it to grant franchises to taxicab operators on such terms as it deems advisable, it being evident that the word "terms" as used in the statute refers to regulations in regard to service rather than to fees or taxes, and this result is consonant with legislative policy as gathered from the history and statutory changes.

CAB CO. *v.* CHARLOTTE.

**9. Taxation § 38a—**

    The provisions of G.S. 105-267 must be strictly complied with, and a taxpayer may recover from a municipality an amount paid under an unauthorized levy only in those cases in which the tax is paid under written protest with later written demand for its return.

**10. Same—**

    G.S. 105-407 applies solely to State taxes and not to taxes of local units.

APPEAL by plaintiffs from *Patton, Special Judge,* at 17 September Term, 1951, of MECKLENBURG.

Civil action by plaintiffs, taxicab owners and operators, for refund of approximately $6,600 alleged to have been illegally collected by the City of Charlotte in connection with granting the plaintiffs franchises to operate taxicabs during the years 1949, 1950, and 1951. The complaint joins two causes of action: the first for refund of $2,205 paid under protest for the year 1951, and the second for approximately $4,400 paid for the years 1949 and 1950, not under protest, but nevertheless, as the plaintiffs allege, under circumstances entitling them to refund.

The case was heard on the plaintiffs' motion for judgment on the pleadings and the defendants' demurrer to the second cause of action for failure to state facts sufficient to constitute a cause of action.

From judgment disallowing the plaintiffs' motion for judgment and sustaining the defendants' demurrer, the plaintiffs appealed, assigning errors.

*Henry L. Strickland for plaintiffs, appellants.*
*John D. Shaw for defendants, appellees.*

JOHNSON, J. It is admitted in the pleadings that the plaintiffs paid the City of Charlotte for each of the three years in question the sum of $51.00 for each taxicab in operation, "$1.00 thereof being for automobile license tag," and $50.00 thereof being assessed by special taxicab ordinance of the City as a fee "for franchised operations" of the cabs.

The plaintiffs contend that by the terms of G.S. 20-97 (a) and (b) the City was limited to the collection of $1.00 for the "license tag" and $15.00 for all other purposes,—a total of $16.00. Accordingly, the plaintiffs insist they are entitled to a refund of $35.00 on each cab licensed. The statute on which they rely (G.S. 20-97) is a part of the composite motor vehicle statute law of the State. It reads as follows:

"20-97. Taxes compensatory; no additional tax.—(a) All taxes levied under the provisions of this article are intended as compensatory taxes for the use and privileges of the public highways of this state, and shall be paid by the commissioner to the state treasurer, to be credited by him to the state highway fund; and no county or municipality shall levy any

license or privilege tax upon the use of any motor vehicle licensed by the state of North Carolina, except that cities and towns may levy not more than one dollar ($1.00) per year upon any such vehicle resident therein : *Provided, however, that cities and towns may levy, in addition to the one dollar ($1.00) per year, herein set forth, a sum not to exceed fifteen dollars ($15.00) per year upon each vehicle operated in such city or town as a taxicab.*

"(b). No additional franchise tax, license tax, or other fee shall be imposed by the state against any franchise motor vehicle carrier taxed under this article *nor shall any county, city or town impose a franchise tax or other fee upon them,* except cities and towns may levy a license tax not in excess of fifteen dollars ($15.00) per year on each vehicle operated in such city as a taxicab as provided in subsection (a) hereof." (Italics added.)

The defendant City of Charlotte relies on the provisions of G.S. 160-200 (36a), as amended by Chapter 564, Session Laws of 1945, to sustain the validity of the ordinance under which it collected the franchise license fee of $50.00 on each cab. This statute is one of a series of enactments by which the Legislature conferred upon cities and towns broad discretionary powers of control over taxicab operators and drivers. These enactments as codified are embraced in the following three sections of the General Statutes of North Carolina: (1) G.S. 20-37; (2) G.S. 20-87 (c); and (3) G.S. 160-200 (36a). These statutes were in force and effect at the times laid in the plaintiffs' complaint.

G.S. 20-37 grants to cities and towns "power to license, regulate, and control drivers and operators of taxicabs" . . .

G.S. 20-87 (c), as amended, precludes the State Department of Motor Vehicles from issuing a license for the operation of any taxicab until the governing body of the city or town in which such taxicab is principally operated, if the principal operation is in a city or town, has issued a certificate showing *inter alia* "that the convenience and necessity of the public requires the operation of such taxicab."

G.S. 160-200 (36a) confers power upon cities and towns to require drivers and operators of taxicabs operating over its streets to apply for and receive a driver's permit before operating any such vehicle, with the governing board being vested with power to reject applications and revoke permits previously issued for failure to meet or comply with certain requirements as to moral character and proficiency as a driver. The statute contains this further provision which is pertinent to this appeal: "The governing board is also authorized to establish the rates which may be charged by taxicab operators, and may grant *franchises* to taxicab operators on such *terms* as it deems advisable." (Italics added.)

The City Council of the City of Charlotte on 3 October, 1946, acting under the provisions of the foregoing statutes, adopted a comprehensive

taxicab ordinance by which it set up the office of Taxicab Inspector and prescribed his duties. The ordinance sets up rules under which taxi-driver permits may be issued and revoked. It also establishes terms and conditions under which taxicab operators may be granted certificates of public convenience and necessity, and prescribes various other rules and regulations in respect to the operation of taxicabs in the City of Charlotte. Among other things, the ordinance provides that each certificate of public convenience and necessity issued by the City Council shall expire "on December 31 of the year during which such certificate was granted," with provisions prescribed for renewal from year to year. The ordinance contains the following requirement for payment of fees in connection with the issuance of certificates:

"SECTION 16.    FEE FOR CERTIFICATE.    The owner of each taxicab which is granted a certificate shall pay annually to the General Treasury of the City the sum of $50.00 for each cab so licensed; provided, however, that in the case of certificates issued on or after July 1st, in each year, the fee shall be $25.00. Such license fees shall be in addition to, and not in lieu of, any other license fees or charges established by proper authority and applicable to taxicabs in this city."

The question thus posed for decision here is this: Is the ordinance of the City of Charlotte requiring taxicab operators to pay an annual franchise or license fee of $50.00 authorized by G.S. 160-200 (36a), as amended, or is it prohibited by the provisions of G.S. 20-97 (a) and (b)?

The salient facts seem to be pleaded in the complaint and admitted in the answer so as to present squarely for interpretation these two statutes upon which decision rests.

In view of the limitations imposed by G.S. 20-97 (a) and (b), the defendant City of Charlotte concedes that the fees collected in excess of $16.00, to wit: $35.00, for each cab may not be justified as items of revenue. (*Cox v. Brown,* 218 N.C. 350, 11 S.E. 2d 152). It contends, however, that under the City Taxicab Ordinance the $50.00 (in addition to the license tag fee of $1.00) may be exacted as a charge for granting and renewing the annual certificates of public convenience and necessity (denominated by the defendants as "franchised certificates"). Thus the City of Charlotte takes the position that the $50.00 charge is not a revenue exaction, but is rather a police power measure, designed to produce funds with which to pay the costs of regulating taxicabs in the City under its regulatory ordinance, and that such comes within the powers conferred upon the City by G.S. 160-200 (36a), as amended, permitting it to "grant franchises to taxicab operators on such terms as it deems advisable." It is urged that the word "terms" as used in the statute is referable to and authorizes the assessment and collection of fees by a city or town in consideration for franchise privileges to be granted taxicab operators. The City of Charlotte contends there is no conflict between

G.S. 20-97 (a) and (b) and the City Taxicab ordinance passed under G.S. 160-200 (36a), as amended, but that if there be conflict the ordinance passed under the latter act must prevail.

Thus we face the question of statutory construction. In the final analysis decision here turns on the legislative intent and meaning of the word "terms" as used in G.S. 160-200 (36a), as amended.

It is an accepted rule of statutory construction that ordinarily words of a statute will be given their natural, approved, and recognized meaning. *Commissioners of Johnston County v. Lacy,* 174 N.C. 141, 93 S.E. 482; *Randall v. Richmond and Danville Railroad Co.,* 107 N.C. 748, 12 S.E. 605; 50 Am. Jur., Statutes, Sec. 238.

It is also an accepted rule of construction that in ascertaining the intent of the Legislature in cases of ambiguity, regard must be had to the subject matter of the statute, as well as its language, *i. e.,* the language of the statute must be read not textually, but contextually, and with reference to the matters dealt with, the objects and purposes sought to be accomplished, and in a sense which harmonizes with the subject matter. *Gill v. Board of Com's. of Wake County,* 160 N.C. 176, top p. 188, 76 S.E. 203; *Spencer v. Seaboard Air Line R. Co.,* 137 N.C. 107, p. 119, 49 S.E. 96; 50 Am. Jur., Statutes, Sec. 292.

It is the policy of the courts to avoid giving statutory phraseology an unusual, artificial, or subtle meaning. *Guano Co. v. Walston,* 187 N.C. 667, p. 672, 122 S.E. 663, and cases cited; 50 Am. Jur., Statutes, Sec. 238.

And where the meaning of a statute is doubtful, the history of legislation on the general subject dealt with, including statutory changes over a period of years, may be considered in connection with the object, purpose, and language of the statute, in order to arrive at its true meaning. *Nance v. Southern R. Co.,* 149 N.C. 366, 63 S.E. 116; *Erie R. Co. v. Steinberg,* 94 Ohio St. 189, 113 N.E. 814. See also 50 Am. Jur., Statutes, Sec. 294, p. 276; Annotation; 70 A.L.R. p. 5 (footnotes). It is also accepted practice in the interpretation of an ambiguous statute for the court to take into consideration the settled policy of the state where such is clearly deducible from consistent acts of the Legislature, and tends to shed light on the legislative intent as to the statute under consideration. 50 Am. Jur., Statutes, Sec. 299. Thus, in the construction of a statute, reference may be had to earlier statutes on the subject which are regarded as in *pari materia* with the later statute. 50 Am. Jur., Statutes, Sec. 354.

And in respect to related statutes, ordinarily they should be construed, if possible by reasonable interpretation, so as to give full force and effect to each of them (50 Am. Jur., Statutes, Sec. 362), it being a cardinal rule of construction that where it is possible to do so, it is the duty of the courts to reconcile laws and adapt that construction of a statute which harmonizes it with other statutory provisions. *Kearney v.*

*Vann,* 154 N.C. 311, 70 S.E. 747; *Corporation v. Motor ·Co.,* 190 N.C. 157, p. 160, 129 S.E. 414. See also 50 Am. Jur., Statutes, Sec. 363.

On the other hand, when the provisions of related statutes are irreconcilable, under reasonable interpretation, and one must give way to the other, ordinarily the last in point of enactment will prevail as being the latest expression of the legislative intent. 50 Am. Jur., Statutes, Sec. 365; *Commissioners v. Commissioners,* 186 N.C. 202, p. 204, 119 S.E. 206.

The word "terms" as used in the statute under consideration has a variety of definitions and is susceptible of a wide range of meaning, depending upon the subject matter to which it relates and the context in which it is used. (Webster). "Terms" is derived from the Latin "termini," meaning limits or bounds. Thus its primary meaning implies fixing the limits or extent of anything. See 62 C.J., p. 714. See also Words and Phrases (Permanent Edition) Vol. 41, p. 395 *et seq.* In the statute at hand, we think the word "terms" is used in its broad, primary sense as referring to the scope and limits of the franchise privileges to be granted by governing boards to cab operators. The more reasonable view seems to be that the Legislature by the use of the word "terms" intended thereby to grant unto the "governing body" of a city or town the power, when issuing franchise certificates to cab operators, to fix the rights of the parties, *i. e.,* to designate the requirements, the regulations, the exactions, the stipulations as to service, and the conditions upon which operators may receive, retain, and renew franchise certificates from the City. This view is supported by the natural inferences deducible from a consideration of the over-all purpose of the statutes,—that of delegating to cities and towns power to control the operation of taxicabs by the grant of franchises.

It is well to examine the meaning and scope of the word "franchise" as used in the statute. Here it denotes a right or privilege conferred by law,—a special privilege conferred by government on an individual, natural or corporate, which is not enjoyed by its citizens generally, of common right. 37 C.J.S., Franchises, Sec. 1; 23 Am. Jur., Franchises, Sec. 2, Ballentine, Law Dictionary, p. 525. Ordinarily, "The grant of a franchise when accepted and acted on creates a contract which is binding on the grantor and the grantee." 37 C.J.S., Franchises, Sec. 8. Hence, the grant of a franchise contemplates, and usually embraces, express conditions and stipulations as to standards of service, and so forth, which the grantee or holder of the franchise must perform. 37 C.J.S., Franchises, Sec. 20, p. 165.

It is generally considered that the obligation resting upon a franchise-grantee to comply with the stipulations, terms, and conditions of the grant constitutes a sufficient consideration to support a franchise granted by public authority. The "benefit to the community may constitute the sole consideration for the grant." 23 Am. Jur., Franchises, Sec. 6.

19—234

Accordingly, we think the word "terms" as used in the instant statute is referable to the covenants to be made and required in connection with the issuance of franchises, rather than to any monetary consideration to be charged therefor.

This view is supported by the natural inferences arising out of the legislative history of these related statutes as they have evolved through successive amendments.

Historically, G.S. 20-97 (a) and (b), (which limits the amount a municipality may levy as a license or privilege tax on the use of a motor vehicle) was section 61, Chapter 407, Public Laws of 1937. As originally enacted, this chapter was known as the Motor Vehicle Act of 1937, which as amended is now codified as Article 3, Chapter 20, of the General Statutes of North Carolina. This statute originally fixed $1.00 as the limit which a municipality might levy as a license or privilege tax on the use of any motor vehicle. The proviso to subsection (a) and the exception to subsection (b), by which the amount municipalities may levy upon taxicabs was increased by $15.00, were added by amendment in 1943. The amendment is part of Chapter 639, Session Laws of 1943, hereinafter referred to as the Taxicab Act of 1943. By the provisions of this act, governing boards of cities and towns were granted extensive powers "to license, regulate and control drivers and operators of taxicabs within the city or town limits." These powers of regulation and control so delegated to cities and towns by the Taxicab Act of 1943 are codified as (1) the proviso to G.S. 20-37 and (2) G.S. 160-200 (36a), as originally codified in the General Statutes of North Carolina of 1943. It thus appears that the Legislature, in conferring upon municipalities these new powers of regulation over taxicabs, took cognizance of the fact that the exercise of such powers of regulation would cast new financial burdens on cities and towns. Therefore, to grant relief for this, the Legislature by the same act which conferred the new powers of municipal control also expressly authorized the levy of an additional annual license or privilege tax of not exceeding $15.00 on each taxicab.

After this was done the Legislature in 1945 further extended the powers of cities and towns over taxicabs by the passage of Chapter 564, Session Laws of 1945, which is hereinafter referred to as the Taxicab Act of 1945. This act amended and extended the provisions of G.S. 160-200 (36a) by adding the following provisions: "The governing body is also authorized to establish the rates which may by charged by taxicab operators, and may grant franchises to taxicab operators on such terms as it deems advisable."

The Taxicab Act of 1945 also amended G.S. 20-87 (c), which has to do with the procedure followed by the State Department of Motor Vehicles in licensing taxicabs. Here the Taxicab Act of 1945 provides that (subject to certain exceptions not material to this appeal), "no license shall

issue for the operation of any taxicab until the governing body of the city or town in which such taxicab is principally operated, if the principal operation is in a city or town, has issued a certificate showing," among other things, "that the convenience and necessity of the public requires the operation of such taxicab."

It thus appears that while the Taxicab Act of 1945 amended and extended the provisions of the Taxicab Act of 1943 so as to confer upon the "governing body" the power to "grant franchises to taxicab operators, on such terms as it deems advisable," and made other material changes in the original act, nevertheless, the latter act leaves unchanged the sections of the act of 1943 by which cities and towns are limited to license or privilege tax levies of $16.00 on each taxicab.

Thus, it would seem that the silence of the 1945 act as to a matter to which the 1943 act had spoken in express terms, indicates a legislative intent to preserve the *status quo,* and negatives the theory of implied repeal of the former act, as urged by the defendants. Repeals by implication are not favored by the law and will not be indulged if there is any other reasonable construction. *Leonard v. Sink,* 198 N.C. 114, top p. 119, 150 S.E. 813. Moreover, an examination of the legislative history of G.S. 20-97 shows a fixed and unvarying legislative policy to curb the powers of municipalities in taxing motor vehicles of all kinds, including taxicabs.

Accordingly, we conclude it was the legislative intent to leave in full force and effect the provisions of G.S. 20-97 (a) and (b), as amended, by which cities and towns are limited to total annual levies of $16.00 in connection with the operation of taxicabs. It follows, therefore, that the City of Charlotte was without power under G.S. 160-200 (36a) or cognate statutes to impose exactions beyond the limits fixed by G.S. 20-97 (a) and (b).

G.S. 105-267 provides, *inter alia,* that "whenever a person shall have a valid defense to the enforcement of the collection of a tax assessed or charged against him or his property, such person shall pay such tax to the proper officer, and notify such officer in writing that he pays the same under protest. Such payment shall be without prejudice to any defense of rights he may have in the premises, and he may, at any time within thirty days after such payment, demand the same in writing from the Commissioner of Revenue of the State, if a State tax, or if a county, city, or town tax, from the treasurer thereof for the benefit or under the authority or by request of which the same was levied; and if the same shall not be refunded within ninety days thereafter, may sue such official in the courts of the State for the amount so demanded."

The plaintiffs complied with the provisions of this statute in respect to the fees paid for the year 1951. Accordingly, they are entitled to

recover back the excess portion of the fees paid for the year 1951, sued on in their first cause of action.

However, the record indicates that the payments for the years 1949 and 1950 were not made under protest, nor did the plaintiffs otherwise comply with the mandatory provisions of G.S. 105-267. This being so, they are not entitled to recover for the excess fees paid in those years, declared on in the second cause of action. Strict compliance with the provisions of this statute is necessary. See *Power Co. v. Clay County,* 213 N.C. 698, p. 708, 197 S.E. 603.

The statute, G.S. 105-407, relied on by the plaintiffs, is specifically limited to State taxes. It has no application to local taxing units.

The results, then, are:

On the first cause of action: Reversed.

On the second cause of action: Affirmed.