IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-209

No. COA19-976

Filed 18 May 2021

Mecklenburg County, No. 18 CVS 12903

C INVESTMENTS 2, LLC, Plaintiff,

v.

ARLENE P. AUGER, HERBERT W. AUGER, ERIC E. CRAIG, GINA CRAIG, LAURA DUPUY, STEPHEN EZZO, JANICE HUFF EZZO, ANNE CARR GILMAN WOOD, as Trustee of the FRANCIS DAVIDSON GILMAN, III TRUST fbo PETS UW dated June 20, 2007, LAUREN HEANEY, BRIDGET HOLDINGS, LLC, GINNER HUDSON, JACK HUDSON, CHAD JULKA, SABRINA JULKA, ARTHUR MAKI, RUTH MAKI, JENNIE RAUBACHER, MATTHEW RAUBACHER, as Co-Trustees of the Raubacher/Cheung Family Trust dated November 11, 2018, LAWRENCE TILLMAN, LINDA TILLMAN, ASHFAQ URAIZEE, JABEEN URAIZEE, JEFFREY STEGALL and VALERIE STEGALL, Defendants.

Appeal by defendants from judgment entered 8 April 2019 by Judge Charles M. Viser in Mecklenburg County Superior Court. Heard in the Court of Appeals 24 September 2020.

*Parker Poe Adams & Bernstein LLP, by Michael G. Adams and Morgan H. Rogers, for plaintiff-appellee.*

*Law Office of Kenneth T. Davies, P.C., by Kenneth T. Davies, for defendants-appellants Arlene Auger, Herbert Auger, Eric Craig, Gina Craig, Stephen Ezzo, Janice Huff Ezzo, Ashfaq Uraizee, and Jabeen Uraizee.*

*Tillman Wright, PLLC, by Chad D. Tillman and Jeremy C. Doerre, for defendants-appellees Lawrence and Linda Tillman.*

*Jordan Price Wall Gray Jones & Carlton PLLC, by H. Weldon Jones, III, for amicus curiae Community Associations Institute.*

*Offit Kurman, P.A., by Zipporah Basile Edwards, for amicus curiae North Carolina Land Title Association.*

*Law Office of Kenneth T. Davies, P.C., by Kenneth T. Davies; Robinson, Bradshaw & Hinson, P.A., by Richard A. Vinroot; and Nexsen Pruet, PLLC, by James C. Smith, for amici curiae C.E. Williams, III, et al.*

*Offit Kurman, P.A., by Amy P. Hunt and Robert B. McNeill, for amici curiae Michael and Karyn Reardon.*

*Roberson Haworth & Reese, PLLC, by Alan B. Powell and Andrew D. Irby, for amicus curiae Lori Postal.*

*Ball Barden & Cury P.A., by J. Boone Tarlton, and Roberts & Stevens, P.A., by Kenneth R. Hunt, for amici curiae Daniel Kayser et al.*

DIETZ, Judge.

For much of our State's history, a title search in North Carolina was a costly, often risky endeavor. Buyers—typically through their real estate attorneys—had to carefully comb back through deeds and other property records, sometimes going back for centuries, to ensure they found every recorded interest in the property, including things like easements and restrictive covenants attached to the land.

In the early 1970s, our State enacted the Real Property Marketable Title Act to simplify these title searches and reduce the costs they imposed on our society. Now, if a property owner has an unbroken chain of title dating back thirty years, earlier rights and interests in the land are extinguished, barring a few narrow exceptions.

¶ 3        This case involves one of these statutory exceptions. The Marketable Title Act does not extinguish a covenant that is part of a scheme of development and that restricts the property to residential use only, or more narrowly to multi-family or single-family residential use only.

¶ 4        The parties in this case own property in a residential subdivision created in the 1950s. The lots are subject to a restrictive covenant limiting them to residential use only, as well as a number of other covenants that govern the number, size, location, and various design elements of structures located on each lot. The trial court entered a declaratory judgment holding that only the first covenant—the one restricting the properties to residential use—survives under the Marketable Title Act and that the remaining challenged covenants were extinguished.

¶ 5        We affirm the trial court's order. Applying the plain and unambiguous language of the Act, the covenants governing the type of structures that can be erected on the property, where they are located, and what they look like are not covenants concerning residential use or, more narrowly, multi-family or single-family residential use. This is confirmed by long-standing precedent from our Supreme Court interpreting language in covenants nearly identical to those at issue in this case.

¶ 6        Defendants urge this Court to depart from the Act's plain language—to, in essence, rewrite the statute—because, in their view, our General Assembly could not

have intended this result. This is so, Defendants argue, because following the Act's plain language would destroy the character of many older neighborhoods that have long been governed by these types of aging restrictive covenants.

¶ 7        What Defendants ask of us is beyond the role of the judicial branch. We interpret statutes as they are written; we do not rewrite statutes to ensure they achieve what we believe is the legislative intent. If our interpretation of the plain language of a statute yields unintended results, the General Assembly can amend the statute to ensure it achieves the intent of the legislative branch of our government.

**Facts and Procedural History**

¶ 8        Country Colony is a residential subdivision in Mecklenburg County developed in the 1950s. In 1952, before selling any lots, the developer recorded nine restrictive covenants. The covenants limit the properties to residential use only and provide further restrictions on the number, size, location, and design elements of the structures located on each lot:

1.  All lots in the tract shall be known and described and used for residential lots only.

2.  No structure shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage, and other outbuildings incidental to residential use of the plot.

3.  No building shall be erected on any residential building

plot nearer than 100 feet to the front lot line nor nearer than 20 feet to any side line.

4. No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

5. No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

6. No dwelling costing less than $10,000.00 shall be permitted on any lot in the tract. The ground floor area of the main structure, exclusive of one story open porches and open car ports, shall be not less than 1200 square feet in case of a one story structure. In the case of a one and one-half, two or two and one-half story structure, the ground floor area of the main structure, exclusive of one-story open porches or open car ports, shall not be less than nine hundred square feet. (It being the intention to require in each instance the erection of such a dwelling as would have cost not less than the minimum cost provided if same had been erected in January, 1952.)

7. A right of way is and shall be reserved along the rear of each lot and along the side line of each lot where necessary, for pole lines, pipes and conduits for use in connection with the supplying public utilities service to the several lots in said development.

8. In the event of the unintentional violation of any of the building line restrictions herein set forth, the parties hereto reserve the right, by and with the mutual written consent of the owner or owners, for the time being of such lot, to change the building line restrictions set forth in this instrument; provided, however, that

> such change shall not exceed ten percent of the original
> requirements of such building line restrictions.
>
> 9. None of the lots shown on said plat shall be subdivided
>    to contain less than two acres, and only one residence
>    shall be erected on each of said lots.

¶ 9     Plaintiff is the owner of seven of the lots. Defendants are the owners of the other lots. Plaintiff brought a declaratory judgment action seeking to extinguish many of these covenants based on our State's Marketable Title Act. The trial court entered summary judgment declaring that the first covenant, which restricts the lots to residential use, is enforceable but the remaining covenants challenged by Plaintiff are extinguished by operation of the Marketable Title Act. Defendants appealed.

**Analysis**

¶ 10     Under the common law, owners of real property acquired and held title to their real property subject to any covenants and other nonpossessory interests that appeared in their property's chain of title. As a result, owners and prospective owners of real property, typically through their real estate attorneys, were required to trace the title to property back for centuries to ensure all enforceable interests in that property were identified. This was often a complicated and time-consuming process that injected significant cost, delay, and uncertainty into our State's real property market.

¶ 11     In 1973, our General Assembly passed the Real Property Marketable Title Act

to simplify title searches and render our State's real estate more marketable. *See* N.C. Gen. Stat. § 47B-1 *et seq*. The Marketable Title Act functions by creating "marketable record title" to real property upon a showing of an unbroken, thirty-year chain of title to real property. *Hill v. Taylor*, 174 N.C. App. 415, 420–21, 621 S.E.2d 284, 288–89 (2005). Once the owner establishes marketable record title, the Act extinguishes "all rights, estates, interests, claims or charges whatsoever, the existence of which depends upon any act, title transaction, event or omission that occurred prior to such 30–year period," including restrictive covenants like the ones at issue in this case, unless those restrictive covenants fall within the exceptions to the Act contained in Section 47B-3. *Id.* (citing N.C. Gen. Stat. §§ 47B-2(c), 47B-3).

¶ 12    The crux of this case is the proper interpretation of one of the exceptions in Section 47B-3, which provides that the Act does not extinguish a covenant applicable to a general or uniform scheme of development which restricts the property to residential use, or more narrowly to multi-family or single-family residential use:

> Such marketable record title shall not affect or extinguish the following rights:
>
> . . .
>
> (13) Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable. The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. Restrictive covenants other than

those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B.

N.C. Gen. Stat. § 47B-3(13).

¶ 13 The trial court declared that the first challenged covenant, providing that all "lots in the tract shall be . . . used for residential lots only" fell within the exception of Section 47B-3(13) and was not extinguished. The court declared that the other challenged covenants—those restricting the size and number of structures erected on lots, establishing setbacks on the property, barring further subdivision of lots, and imposing various other architectural limitations on structures built upon the lots— did not fall within Section 47B-3(13) and were extinguished under the Act.

¶ 14 On appeal, Defendants contend that the trial court erred in its interpretation of N.C. Gen. Stat. § 47B-3(13) and that all of the challenged covenants survive under this exception to the Marketable Title Act. We thus begin our analysis by interpreting the language of N.C. Gen. Stat. § 47B-3(13).

¶ 15 "The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish." *State v. Lemus*, __ N.C. App. __, 848 S.E.2d 239, 242 (2020). "But, if the statutory language is clear and unambiguous, then the statutory analysis ends and the court gives the words in the statute their plain and definite meaning." *Id.*

¶ 16        Defendants argue that, under N.C. Gen. Stat. § 47B-3(13), if a collection of covenants governing a uniform scheme of development include a restriction on residential use only, the Marketable Title Act exempts *all* covenants applying to that uniform scheme of development. This is so, Defendants argue, because the phrase "which restrict the property to residential use only" modifies the immediately preceding phrase "general or uniform scheme of development":

> (13) Covenants *applicable to a general or uniform scheme of development which restrict the property to residential use only*, provided said covenants are otherwise enforceable. . . .

N.C. Gen. Stat. § 47B-3(13) (emphasis added).

¶ 17        The flaw in this argument is that the verb "restrict" is in its plural form, which means that, in the phrase "Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only," the phrase "which restrict" is modifying the plural "covenants" and not the singular "scheme of development." We thus reject Defendants' proposed interpretation and hold that this exception in N.C. Gen. Stat. § 47B-3(13) applies only to "covenants . . . which restrict the property to residential use only" and not to other covenants that are part of a general or uniform scheme of development and merely accompany a covenant restricting the property to residential use only.

¶ 18        Defendants next argue that, even if the statute applies only to "covenants . . .

which restrict the property to residential use only," that phrase should be read broadly to include accompanying covenants *relating to* the residential use of the property, such as those governing the size and number of structures erected on lots and imposing various architectural limitations on structures built upon the lots.

¶ 19        But again, this proposed interpretation cannot be squared with the statute's plain language. The next two sentences of N.C. Gen. Stat. § 47B-3(13) further define the types of covenants that are subject to the statutory exception and expressly state that the exception is limited *solely* to those covenants restricting property to residential use, or more narrowly to multi-family or single-family residential use, and that it does *not* apply to other, related covenants:

> (13) Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable. *The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B.*

*Id.* (emphasis added).

¶ 20        By stating that the excepted covenant "may restrict the property to multi-family or single-family residential use or simply to residential use," the statute indicates that it applies solely to these specific covenants, not to other, related ones that might accompany these specific covenants as part of a uniform scheme of

development. Defendants' proposed interpretation would render the second sentence superfluous by broadening the exception for residential use to include many other forms of covenants.

¶ 21 The same is true of the third sentence, which again expressly indicates that the statute should *not* be read broadly and that it excepts only those covenants "which limit the property to residential use." *Id.* This language, too, would be superfluous if we adopted Defendants' proposed interpretation. Settled principles of statutory construction require us to follow a statute's plain language and avoid interpretations that render meaningless the words chosen by our legislature. *State v. Beck*, 359 N.C. 611, 614–15, 614 S.E.2d 274, 277 (2005).

¶ 22 The dissent also contends that, by using the phrase "general or uniform scheme of development," the General Assembly signaled that this provision might exempt covenants concerning how a planned community is developed, not merely how the properties within it are used. Thus, the dissent reasons, the phrases "residential use" and "multi-family or single-family residential use" are ambiguous and can be read more broadly than their plain language requires. But the limiting phrase "general or uniform scheme of development" serves a plain and unambiguous purpose: it restricts the exemption to these sorts of planned communities and not to a covenant attached only to a single property. There is nothing ambiguous about this statutory language.

¶ 23 Accordingly, we reject Defendants' arguments and hold that the exception in

Section 47B-3(13) applies only to covenants applicable to a general or uniform scheme of development that either restrict the property to residential use only, or more narrowly restrict the property to multi-family or single-family residential use only.

¶ 24        Having interpreted this provision of the Marketable Title Act, we turn to its application in this case. We agree with the trial court that the first covenant, stating that all "lots in the tract shall be . . . used for residential lots only" survives under the Marketable Title Act. The parties concede that all of the challenged covenants are ones applicable to a general or uniform scheme of development. This particular covenant restricts the properties to residential use only. It is therefore excepted from extinguishment under the Marketable Title Act by the plain terms of Section 47B-3(13).

¶ 25        We likewise agree with the trial court that the remaining challenged covenants are not subject to the exception in Section 47B-3(13) and are extinguished. Most of the provisions in these covenants quite plainly fall outside the exception: the setback requirements, the restrictions on subdividing lots, and the various architectural limitations. None of these provisions restrict the property to residential use, or more narrowly to multi-family or single-family residential use, and therefore are

extinguished.[1]

Two remaining provisions in the challenged covenants merit further analysis: (1) the provision that "No structure shall be erected, altered, placed or permitted . . . other than one detached single-family dwelling" and (2) the provision that "only one residence shall be erected on each of said lots." Defendants contend that these two restrictions, in effect, limit the property to single-family use. But again, Defendants' argument cannot be squared with the language carefully chosen by our General Assembly.

The General Assembly could have stated that covenants restricting property to single-family or multi-family *use* and covenants restricting property to single-family or multi-family *structures* both survive under the Marketable Title Act. But that is not what the legislature said. The Act does not save covenants addressing the *type of structure* on property; it saves only those covenants restricting how that structure is *used*:

> Such marketable record title shall not affect or extinguish the following rights:
>
> . . .

---

[1] The Marketable Title Act contains other exceptions, some of which arguably could apply to certain covenants challenged in this case, such as the seventh covenant concerning a right of way for utility lines, pipes, and conduits for public utilities. The parties in this appeal addressed only the exception in N.C. Gen. Stat. § 47B-3(13) and we therefore limit our appellate review solely to those arguments. *See* N.C. R. App. P. 28(b)(6).

> (13) Covenants applicable to a general or uniform scheme of development *which restrict the property to residential use only*, provided said covenants are otherwise enforceable. *The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. . . .*

N.C. Gen. Stat. § 47B-3(13) (emphasis added).

¶ 28 Turning to the covenant barring any structure "other than one detached single-family dwelling," we conclude that this covenant restricts the type of structure erected on the property and says nothing about how that structure is used.

¶ 29 We know this because our Supreme Court has held it. *See J. T. Hobby & Son, Inc. v. Fam. Homes of Wake Cty., Inc.*, 302 N.C. 64, 74–75, 274 S.E.2d 174, 181 (1981). In *Hobby*, there were two relevant covenants governing the residential subdivision in the case: one stating that no lot "shall be used except for residential purposes" and another stating that no "building shall be erected . . . other than one detached single-family dwelling." *Id.* at 65–66, 274 S.E.2d at 176. The defendants, who operated a family care business, bought a home in the subdivision and converted it for multi-family use by four special needs adults and their care staff. *Id.* at 72, 274 S.E.2d at 179–80. The Supreme Court held that this was consistent with both covenants: the family care home was used for residential purposes, thus complying with the first covenant, and the building itself was a single-family dwelling, thus complying with the second covenant. *Id.* at 74–75, 274 S.E.2d at 181. Critically important for this

case, the Supreme Court held that the covenant's language restricting the property to "one detached single-family dwelling" did not limit the *use* of that dwelling to a single family. *Id.*

¶ 30        Here, too, a resident of this subdivision could convert their single-family dwelling for multi-family use without running afoul of the language in this covenant. The covenant restricts the property to one "detached single-family dwelling," a restriction on the structure. It does not "restrict the property to multi-family or single-family residential use or simply to residential use." N.C. Gen. Stat. § 47B-3(13). So, under the plain terms of the Marketable Title Act, it is extinguished.

¶ 31        We next turn to the covenant stating that "only one residence shall be erected on each of said lots." Again, this covenant governs how many structures can be erected on a lot, not how they are used. And, again, we know this because our Supreme Court has held it. *Huntington v. Dennis*, 195 N.C. 759, 760–61, 143 S.E. 521, 521–22 (1928). In *Huntington*, the Court held that an apartment complex with many separate apartments is a single "residence" for purposes of a covenant stating that "[a]ny residence erected on the property shall cost not less than $7,500." *Id.* The covenant in this case stating that "only one residence shall be erected on each of said lots," like the similar covenant in *Huntington*, only restricts the number of structures erected on the property; it does not restrict whether that structure is for single-family or multi-family use.

¶ 32    Defendants urge this Court to ignore the statute's plain language because applying that plain language to these two covenants "would destroy the common scheme of development for Country Colony, stripping the neighborhood naked, with only the 'fig leaf' of the residential use covenant." This, Defendants contend, "could not have been the intent of the legislature, or it would, and could, have said so expressly."

¶ 33    This reasoning reveals the ultimate flaw in Defendants' argument—the legislature did say so expressly, in the words they chose when they crafted the statute. The role of the courts is to interpret statutes as they are written. We do not rewrite statutes to ensure they achieve what we, or the parties in a lawsuit, imagine are the legislature's policy goals. *Sykes v. Vixamar*, 266 N.C. App. 130, 138, 830 S.E.2d 669, 675 (2019).

¶ 34    Now, to be sure, if the plain reading of a statute leads to a result so absurd that no reasonable legislator could have intended it, we can ignore that absurd interpretation and find a reasonable one. *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979). But the plain language of the Marketable Title Act is not absurd. There are countless reasons why rational legislators might have wanted to preserve restrictions on use but not restrictions on structure—not least of which is that the original proposal for our State's Marketable Title Act might have included exemptions for both structure and use, but the General

Assembly only had the votes to enact a bill focusing on use.

And even if we, as judges, agreed with Defendants that the legislature might have intended something other than what the plain language provides, we would still follow the statute's language. As this Court succinctly explained in a similar dilemma several years ago, we have "two choices: (1) we can apply the plain language and settled canons of statutory construction, which results in a statutory interpretation that the legislature may not have intended; or (2) we can interpret the statute in the way we, as judges, *think* the legislature intended, which may also result in a statutory interpretation that the legislature may not have intended." *Wells Fargo Bank, N.A. v. Am. Nat'l Bank & Tr. Co.*, 250 N.C. App. 280, 287, 791 S.E.2d 906, 911 (2016). "The choice," as we held in *Wells Fargo*, "is obvious." *Id.* "We will not speculate about what we think the legislature intended; we will apply the plain language and applicable statutory canons and, if the result is unintended, the legislature will clarify the statute." *Id.*

The dissent also emphasizes that courts do not construe statutes in favor of unrestricted use of land, as we are required to do with covenants. This is correct; we construe statutes by examining the words of the statute. The dissent struggles to understand why our General Assembly chose the words it used—in particular, the words "residential use" and "multi-family or single-family residential use." But our task is not to speculate about why the legislature chose particular words, but to

interpret those words according to their plain meaning and ordinary usage. *Raleigh Hous. Auth. v. Winston*, 2021-NCSC-16, ¶ 8. The dissent also suggests that the Supreme Court, by affirming the dissent in *Winding Ridge*, held that the words "residential use" and "multi-family or single-family residential use" are ambiguous. But *Winding Ridge* holds precisely the opposite—that there is nothing ambiguous about words "restricting the type of occupancy or use that may be made of the dwelling." *Winding Ridge Homeowners Ass'n, Inc. v. Joffe*, 362 N.C. 225, 657 S.E.2d 356 (2008), *reversing for reasons in dissent*, 184 N.C. App. 629, 640, 646 S.E.2d 801, 808 (2007). The ambiguity in *Winding Ridge* arose because the covenants' headings purported to address "Use Restrictions" and "Use of Property," but the covenants themselves focused "exclusively on construction and other structural concepts" and not on use. *Id.*

¶ 37 Finally, our analysis, unlike that of both Defendants and our dissenting colleague, is consistent with the stated intent of the Act. The General Assembly explained in the Act that "Land is a basic resource of the people of the State of North Carolina and should be made freely alienable and marketable so far as is practicable"; that "Nonpossessory interests" in real property "often constitute unreasonable restraints on the alienation and marketability of real property"; and that "Such interests . . . are prolific producers of litigation to clear and quiet titles which cause delays in real property transactions and fetter the marketability of real property."

N.C. Gen. Stat. § 47B-1. Then, the legislature declared that the Act "shall be liberally construed to effect the legislative purpose of simplifying and facilitating real property title transactions by allowing persons to rely on a record chain of title of 30 years as described in G.S. 47B-2, subject only to such limitations as appear in G.S. 47B-3." *Id.* § 47B-9.

So a key stated purpose of the Marketable Title Act is to make it easy for anyone buying real property to know precisely what covenants and other nonpossessory restrictions are, and are not, attached to the property. This, in turn, encourages the marketability of our State's real property. Defendants' interpretation would do the opposite. If we adopted Defendants' strained interpretation, real property purchasers could not be certain what they were getting. There would be a chance that some judge out there somewhere could be persuaded that a covenant, even if not covered by the Act's plain language, was close enough to survive. There would be "prolific producers of litigation" and "delays in real property transactions" and burdens on "the marketability of real property." *Id.* § 47B-1. There would be everything the legislature expressly set out to prevent.

Simply put, we reject Defendants' (and the dissent's) invitation to trek into the minds of the legislature and rewrite the statute. The Marketable Title Act is clear and unambiguous. Under N.C. Gen. Stat. § 47B-3(13), the covenants that survive are those "applicable to a general or uniform scheme of development" that "restrict the

property to multi-family or single-family residential use or simply to residential use." That's it. Anything else is gone.

¶ 40        This means, as the trial court properly held, that the only covenant in this case that survives is the first one, stating that all "lots in the tract shall be . . . used for residential lots only." The other challenged covenants are extinguished.

## Conclusion

¶ 41        We affirm the trial court's judgment.

AFFIRMED.

Judge INMAN concurs.

Judge DILLON concurs in part and dissents in part with separate opinion.

DILLON, Judge, concurring in part, dissenting in part.

¶ 42     The appeal concerns Country Colony's thirteen (13) private restrictive covenants. But we are not being asked to interpret those covenants; there is no argument between the parties as to *their* meaning. Rather, we are called upon to interpret a provision in our General Statutes, specifically N.C. Gen. Stat. § 47B-3(13) (2018), a provision that excepts certain private restrictive covenants from being extinguished by operation of our Real Marketable Title Act. This provision saves from the Act's operation:

> Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable. The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B.

N.C. Gen. Stat. § 47B-3(13).

¶ 43     I agree with the majority that this statutory provision saves the first private restrictive covenant at issue in this case, which states that the lots in Country Colony "shall be . . . used for residential lots only."

¶ 44     But, unlike the majority, I also conclude that the statutory provision—specifically the portion of the second sentence which saves private covenants which "restrict the [burdened] property to . . . single-family residential use"—covers the portions of Country Colony's second and ninth covenants, *which restrict the use of*

*Dillon, J., concurring in part, dissenting in part.*

*each lot to a single-family residential structure.* In other words, I conclude that the above statutory language describes both structural covenants and occupancy covenants; that is, occupancy covenants which limit the use of property to occupancy by a single family *and* structural covenants which limit the use of property to the development of a single-family type residential structure. Accordingly, on this point, I dissent.

¶ 45 In determining whether subsection (13) covers the covenants restricting the use of the lots to single-family type structures, we must be mindful that we are interpreting the words of a <u>statute</u> enacted by our General Assembly and *not* the words of a <u>private restrictive covenant</u>. It is true that, whether interpreting a statute or a private covenant, our goal is to discern *the intent* of the drafter.[2] However, when the words used by the drafter are ambiguous (capable of more than one meaning), rules for interpreting a statute differ from rules for interpreting a private restrictive covenant.

¶ 46 Specifically, our Supreme Court mandates that ambiguities in the text of a private restrictive covenant *must* be resolved in favor of the unrestrained use of the real estate burdened by the covenant, based on the policy that private restrictions

---

[2] *See State v. Rankin*, 371 N.C. 885, 889, 821 S.E.2d 787, 792 (2018) ("The goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment.").

which burden the use of land are generally disfavored:

> We begin our analysis of this case with a fundamental premise of the law of real property. While the intentions of the parties to restrictive covenants ordinarily control the construction of covenants . . . such covenants are not favored by the law . . . and they will be construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land.

*J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc.*, 302 N.C. 64, 70, 274 S.E.2d 174, 178 (1981) (citations omitted).

Our Supreme Court, however, mandates a different rule when construing the words in an ambiguous statute. We do not construe ambiguous statutory provisions *strictly*, as we would the words in a private restrictive covenant, but rather:

> [In] ascertaining the intent of the Legislature in cases of ambiguity, regard must be had to the subject matter of the statute, as well as its language, *i.e.*, the language must be read *not textually, but contextually*, and with reference to the matters dealt with, the objects and purposes sought to be accomplished, and in a sense which harmonizes with the subject matter.

*Victory Cab Co. v. Charlotte*, 234 N.C. 572, 576, 68 S.E.2d 433, 436 (1951) (emphasis added); *see also Rankin*, 371 N.C. at 889, 821 S.E.2d at 792 ("The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish.").

The majority correctly points out that our Supreme Court has repeatedly held that private restrictive covenants limiting a lot to a single-family *structure* will not

*Dillon, J., concurring in part, dissenting in part.*

be construed to limit *the occupancy use* of that structure—that is, a private covenant restricting property to a single-family type structure will not be construed to prevent members of different families from *using* the structure at the same time. *See, e.g., Winding Ridge v. Joffe,* 362 N.C. 225, 657 S.E.2d 356 (2008) (adopting *per curiam* the dissenting opinion in 184 N.C. App. 629, 646 S.E.2d 801 (2007)); *Hobby*, 302 N.C. at 74-75, 274 S.E.2d at 181-82. But in *Winding Ridge* and *Hobby*, our Supreme Court held in each case that the covenant language at issue was ambiguous and then resolved the ambiguity by applying the rule "that any doubt arising or ambiguity appearing [in a covenant] will be resolved against the validity of the restriction[.]" *Edney v. Powers*, 224 N.C. 441, 443, 31 S.E.2d 372, 374 (1944).

¶ 49        For instance, in *Hobby*, our Supreme Court explained:

> We disagree with the position taken by plaintiffs [who were seeking a broad interpretation of the covenants] for several reasons.
>
> First, plaintiffs' position is inconsistent with one of the fundamental premises of the law as it relates to restrictive covenants: Such provisions are not favored by the law and they will be construed to the end that all ambiguities will be resolved in favor of the free alienation of land.
>
> While it is possible that a restriction as to the type of structure would, in some instances, limit the character of the type of usage to which the building is employed, we conclude that such is not necessarily the case.

*Hobby*, 302 N.C. at 74, 274 S.E.2d at 181. And in *Winding Ridge*, our Supreme Court

adopted the reasoning of the dissenting judge in our Court, who reasoned:

> In any event, in light of *Hobby* [and another case], the restrictive covenant in this case is at best ambiguous. It cannot be viewed as being "clearly and unambiguously drafted," as required by *Hobby*. In the absence of the requisite clarity, the ambiguity must be resolved in favor of free use of property.

*Winding Ridge*, 184 N.C. App. at 641, 646 S.E.2d at 809 (citation omitted).

¶ 50        However, *Hobby* and *Winding Ridge* are not directly on point, as those cases concern the interpretation of ambiguous private restrictive covenants, not of an ambiguous statute. Notwithstanding, the reasoning in those decisions does suggest that Chapter 47B-3(13) is ambiguous. Indeed, *Winding Ridge* stands for the proposition that language referring to the "use of the 'property,' [is a] concept equally consistent with both structural and occupancy restrictions." *Id.* at 641, 646 S.E.2d at 809. Therefore, the language in Chapter 47B-3(13) referring to covenants restricting property to single-family residential use is equally consistent with both structural and occupancy restrictions.

¶ 51        We must, therefore, look to the context and subject matter of the statute to determine whether our General Assembly intended "single-family residential use" to be read narrowly, to include only covenants restricting how structures are occupied, no matter their design, *or* whether our General Assembly intended that phrase to be read more broadly to also include structural covenants (i.e., covenants restricting the

*Dillon, J., concurring in part, dissenting in part.*

use of the property itself to single-family residential structures).

¶ 52 Again, our Supreme Court instructs that "regard must be had to the subject matter of the statute." *Victory Cab*, *supra*. And in my view, the subject matter of Chapter 47B-3(13) strongly suggests that our General Assembly was, at least in part, concerned with protecting covenants restricting the type of structures developed, as the statutory provision is expressly limited in application to "[c]ovenants applicable to a general or uniform scheme of *development*[.]"

¶ 53 Also, the statute speaks of covenants restricting how "the property" is used, not merely how "the structures" on those properties are used. As explained in *Winding Ridge*, a covenant restricting a "property" to "residential use" *could reasonably be* read to include, not only occupancy restrictions, but also structural restrictions.

¶ 54 Further, the second sentence in Chapter 47B-3(13), contextually, suggests that the General Assembly was concerned, at least in part, with saving structural restrictions. For instance, this sentence which preserves "single-family residential use" covenants also preserves "multi-family [] residential use" covenants. In my view, "multi-family [] residential use" covenants most logically include structural restrictions which only allow multi-family type buildings (duplexes, quadruplexes, and the like) and prohibit single-family residential type structures. Covenants requiring multi-family *structures* are much more prevalent. I am unaware of any

private covenant in North Carolina (though they might exist) that restricts the *occupancy* of a structure to multi-family use, irrespective of the type of structure placed on the property. Indeed, an owner of a duplex subject to a multi-family "occupancy" covenant would be in violation whenever there was a vacancy, as during those times, the duplex structure would only be occupied by a single family. By preserving "multi-family" use covenants, it is logical to surmise that our General Assembly had structural covenants in mind.

¶ 55 I do agree with the majority that our goal is to construe the statute *as written* and not read in language that is not there. But I am not reading in any language, as covenants restricting the use of property is "a concept equally consistent with both structural and occupancy restrictions." *Winding Ridge, supra.* It certainly could be argued that the better policy would be to favor protecting *all* the Country Colony covenants, to better preserve the character of this older neighborhood. But we are not the General Assembly, and Chapter 47B-3(13) could not be clearer: "Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B." Accordingly, I agree with the majority that the remaining Country Colony covenants, for instance the covenant limiting *the size* of each lot, are not protected by Chapter 47B-3(13).

¶ 56 This is not to say that our General Assembly forbids older neighborhoods from retaining their character. Indeed, that body has provided a means within the Act by

*Dillon, J., concurring in part, dissenting in part.*

which a lot owner in an older neighborhood may preserve all covenants. Specifically, Section 47B-4 allows *any* lot owner in an older neighborhood with covenants about to expire by operation of the Act to preserve *all* the covenants for another thirty (30) years. They do this by simply filing a notice of the covenants in the county's register of deeds, naming the other lot owners as grantees (so that the notice of the covenants will be discovered during a title search of any of the neighborhood lots going back thirty (30) years). It is simply that our General Assembly has chosen to favor the policy purposes of the Act—to simplify title searches—over the preservation of most types of restrictions which create uniformity within a neighborhood, but which do not appear recently in the chains of title.